Lane McNAMARA, et al., Plaintiffs,

v.

BRE–X MINERALS LTD.,
et al., Defendants.

No. 5–97CV–159.

United States District Court,
E.D. Texas,
Texarkana Division.

July 13, 1999.

H. Lee Godfrey, Charles Robert Esk-ridge, III, Susman Godfrey LLP, Houston, TX, Damon Young, Young & Pickett, Texarkana, TX, Michael C. Spencer, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for plaintiffs.

T. Richard Handler, Jenkins & Gilchrist, Dallas, TX, John L. Verner, Calvin Gibbs & Verner, Houston, TX, David Boies, Boise & Schiller, Armonk, NY, Robert E. Dodson, Gooding & Dodson, Texarkana, TX, Glen Carter Hudspeth, Texarkana, TX, Karen Patton Seymour, Tiffany M. Erwin, D. Stewart Meiklejohn, Sharon Nelles, Sullivan & Cromwell, New York City, Preston Worley McGee, Tyler, TX, Gary D. Grimes, David Gibson Paul, Grimes & Paul, Texarkana, TX, Johnny Paul Arnold, Texarkana, TX, David J. Beck, L. Nicole Batey, Eric J. R. Nichols, Beck Redden & Secrest LLP, Houston, TX, John Hess McElhaney, Locke Punell Rain Harrell, Dallas, TX, John David Crisp, Crisp Jordan & Boyd LLP, Texarkana, TX, Zack A. Clement, Linda L. Addison, William J. Boyce, Preston Worley McGee, Fulbright & Jaworski, Houston, TX, Robert M. Buschmann, Daniel R. Murdock, Winston & Strawn, New York City, Nicholas H. Patton, Patton Tidwell & Sandefur, Texarkana, TX, J. Hoke Peacock, II, Oragin Bell & Tucker, Beaumont, TX, Bruce Domenick Angiolillio, Simon A. Steel, Michael A. Berg, Simpson, Thacher & Bartlett, New York City, James N. Haltom, Patton Haltom Roberts McWilliams & Greer LLP, Texarkana, TX, Eric F. Grossman, Lewis B. Kaden, Lawrence J. Portnoy, Davis Polk & Wardell, New York City, for defendants.

## ORDER

FOLSOM, District Judge.

Several Defendants in this action have filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b). The motions of the following Defendants are well taken: Barrick Gold Corporation ("Barrick"); Lehman Brothers Inc. ("Lehman"); J.P. Morgan Securities, Inc. ("J.P.Morgan"); and Nesbitt Burns Inc. ("Nesbitt"). Also well taken are the motions of the following Defendants (collectively referred to as the "Kilborn Defendants"): P.T. Kilborn Pakar Rekayasa ("P.T.Kilborn"); Kilborn Engineering Pacific Ltd. ("Kilborn Engineering"); SNC-Lavalin Inc. ("SNC"), John Felderhof's motion to dismiss is not well taken.

## I. BACKGROUND

This is a securities fraud case. Seeking class certification, the named Plaintiffs are persons who purchased common stock of Bre-X Minerals Ltd. ("Bre-X") and/or Bresea Resources Ltd. ("Bresea") between January 17, 1994 and May 2, 1997. The Plaintiffs essentially allege that the Defendants' omissions and misrepresentations artificially inflated the value of these stocks.

### A. Bre-X and Bresea

The central player in this action is Defendant Bre-X, a publicly traded mineral exploration corporation headquartered in Calgary, Alberta, Canada. Bre-X common stock was traded on the Alberta Stock Exchange at all times during the purport-

ed class period. The stock was traded on the Toronto Stock Exchange beginning April 23, 1996, and on the NASDAQ National Market beginning August 19, 1996. Defendant Bresea is a Canadian holding company which owns (or at least owned at one time) a twenty-five percent share of Bre-X.

In 1993, Bre-X acquired mineral rights in the Busang area of the East Kalimantan province of Indonesia. The Plaintiffs allege that during the purported class period, Bre-X and its insiders misled its stockholders and the public by falsely announcing increasingly larger estimates of a gold resource that it had discovered in the Busang area through exploratory drilling. In particular, the Plaintiffs accuse Bre-X of numerous misstatements in estimating the amount of gold at this site from 3 million ounces in 1994 to 200 million ounces in the spring of 1997. Bre-X also allegedly tampered with core samples before they were sent to a laboratory for testing.

The increasing gold estimates allegedly allowed Bre-X and Bresea stock to sell at artificially inflated prices. Things went downhill, however, in March 1997, when an independent mining consultant concluded that the prior estimates concerning the quantity of gold at Busang had been overstated because of invalid samples and improper testing of the samples. Stock prices began to fall, and Bre-X is now in bankruptcy.

### B. Other Defendants

In addition to Bre-X and Bresea, the Plaintiffs have named fifteen other Defendants. Eight of them are individuals who were Bre-X officers and/or directors ("Insider Defendants"). Defendants P.T. Kilborn and Kilborn Engineering provided geostatistical services to Bre-X and issued reports to substantiate the claims of gold. SNC is the parent corporation of Kilborn Engineering.

Defendant J.P. Morgan, an American corporation, acted as a financial advisor to Bre-X beginning in approximately September 1996. Defendant Lehman, also an American corporation, issued some positive reports about the presence of gold in Busang and made profits selling stock to its customers.

Defendant Nesbitt Burns is a Canadian stock brokerage that underwrote Bre-X stock and syndicated Bre-X private stock. Defendant Barrick is a Canadian group that negotiated with Bre-X about the possibility of a joint venture for the Busang project.

### C. Plaintiffs' Claims

The Plaintiffs have brought the following three causes of action against all of the moving Defendants: (1) violations of Section 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") (found at 15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (found at 17 C.F.R. § 240.10b-5); (2) negligent misrepresentation; and (3) common law fraud. Additionally, the Plaintiffs charge Felderhof, one of the Insider Defendants, with control person liability.

### II. RELEVANT LAW

In deciding a motion to dismiss for failure to state a claim, the Court must look only to facts stated in the complaint and in documents attached to or incorporated in the complaint. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). The Court may also take judicial notice of the contents of certain documents filed with the Securities Exchange Commission. *Id.* at 1018.

For purposes of deciding the instant motions, the Court will accept as true the well-pleaded factual allegations made in the Plaintiffs' complaint and any reasonable inferences which can be drawn from them. *Tuchman v. DSC Comm.*, 14 F.3d 1061, 1067 (5th Cir.1994). The Plaintiffs, however, "must plead specific facts, not merely conclusory allegations. . . ." *Id.* The Court will "not accept as true conclusory

allegations or unwarranted deductions of fact." *Id.*

### A. 10b–5 Claims

The Plaintiffs bring their primary claim under section 10(b) of the Exchange Act. This section makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC rule promulgated under section 10(b), known as Rule 10b–5, which makes it unlawful for any person, directly or indirectly

[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . .

. . .

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. For ease of discussion, the Court will refer to these claims as the "10b–5 claims."

To establish their fraud claims (including the 10b–5 claims), the Plaintiffs must show "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the [Plaintiffs] relied (5) that proximately caused [the Plaintiffs'] injury." *Tuchman,* 14 F.3d at 1067 (quoting *Cyrak v. Lemon,* 919 F.2d 320, 325 (5th Cir.1990)).

A false statement or omission is material if its disclosure would alter the "total mix" of facts available to an investor and "if there is a substantial likelihood a reasonable shareholder would consider it important" to the investment decision. *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Whether a statement is material is usually a question for the fact finder. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A complaint should not be dismissed on the grounds that the alleged misstatements or omissions are immaterial unless they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

To satisfy the reliance elements, the Plaintiffs in this action rely on the "fraud on the market" doctrine. The premise of this doctrine is that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, all material misrepresentations." *Basic,* 485 U.S. at 246, 108 S.Ct. 978. Under this doctrine, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed". *Id.* at 247, 108 S.Ct. 978. To satisfy their pleading burden on causation, the Plaintiffs "need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *See Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 626 (N.D.Tex.1998).

### B. Pleading Requirements under Rule 9(b)

On a motion to dismiss a federal securities fraud case for failure to state a claim, the Court must apply the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). *Williams v. WMX Tech., Inc.,* 112 F.3d 175, 177 (5th Cir.1997). These pleading

requirements also apply to state law claims of fraud and misrepresentation. *Id.*

Rule 9(b) requires the Plaintiffs in this action to plead the circumstances constituting the fraud they allege with particularity. The Plaintiffs must specify the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams,* 112 F.3d at 177 (quoting *Tuchman,* 14 F.3d at 1068).

Additionally, the Plaintiffs must explain why the statements were fraudulent. *Williams,* 112 F.3d at 177 (citing *Mills v. Polar Molecular,* 12 F.3d 1170, 1175 (2d Cir.1993)). The complaint must set forth an "explanation as to why the disputed statement was untrue or misleading when made." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994). "This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Id.* at 1549.

This heightened pleading standard "serves an important screening function in securities fraud suits." *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994). It "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman,* 14 F.3d at 1067.

Additionally, the Plaintiffs must allege facts demonstrating that the defendant acted with scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). "Scienter must be shown because not every misstatement or omission in a corporation's disclosure gives rise to a Rule 10b–5 claim." *Id.*

To satisfy the scienter requirement, the Plaintiffs must set forth facts to support an inference that the Defendants acted with intent or were severely reckless. *Lovelace,* 78 F.3d at 1018. "[R]ote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)." *Id.* at 1019.

An inference of fraudulent intent is supported if the Plaintiffs either "(1) show a defendant's motive [and opportunity] to commit securities fraud, or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Id.* at 1018–19. If the Plaintiffs do not rely upon the "motive" prong, they "face the more stringent standard of identifying circumstances that indicate conscious behavior by the Defendants." *Id.* at 1019 n. 3. "Under this standard, 'the strength of the circumstantial evidence must be correspondingly greater' than the evidence required under the motive standard." *Id.* (quoting *Tuchman,* 14 F.3d at 1068). The strength of the evidence must likewise be greater when the Plaintiffs rely on circumstantial evidence of recklessness.

A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an "extreme departure from the standards of ordinary care," and (2) "present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 1018 n. 2 (citing *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981)). "[A] conscious purpose to avoid learning the truthfulness of a statement is an extreme departure from the standards of ordinary care." *Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990) (quoting *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 962 (5th Cir. 1981)). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1255

(N.D.Ill.1997) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)).

▮ Opportunity is shown by alleging a combination of circumstances that indicate the defendant had "access to the channels of communication such that a defendant can effectively disseminate false and misleading information to the investing public either directly or indirectly" and "access to specific non-public, internal information regarding the allegedly false and misleading statements." *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1352 (S.D.Cal.1998) (citing *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 185 (2d Cir. 1995)).

▮ To sufficiently allege motive, the Plaintiffs must point to "concrete benefits that could be realized by one or more of the false statements...." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130. Plaintiffs do not sufficiently allege motive by making generic allegations that the defendant had a financial interest in carrying out the alleged fraud. *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.,* 941 F.Supp. 1369, 1377 (S.D.N.Y. 1996). Also insufficient are allegations that a defendant acted to improve a company's financial health or reputation. *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297 (C.D.Cal.1996). Similarly, alleging the motive of increasing capital is not enough. *Id.*

▮ However, "[a]llegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite 'motive' for a scienter allegation." *Marksman,* 927 F.Supp. at 1312 (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)).

To sum up, under Rule 9(b), plaintiffs in fraud actions must adequately plead facts showing that the defendant acted with scienter. They can accomplish this by any of the following three avenues: (1) showing the defendant's motive and opportunity for perpetrating the fraud ("motive test"); (2) alleging facts that constitute strong circumstantial evidence of severe recklessness ("recklessness test"); or (3) identifying circumstances that strongly indicate conscious behavior on the part of the defendant ("conscious behavior test").[1]

### C. 1995 Reform Act

Congress addressed the pleading requirements for securities fraud actions in the Private Securities Litigation Reform Act of 1995, Pub.L. No 104–67 (the "Reform Act"). The Reform Act requires the court, upon a motion of any defendant, to dismiss a case when certain pleading requirements are not met. 15 U.S.C. § 78u–4(b)(3).

Most courts that have addressed the issue agree that Congress intended for the Reform Act to heighten the pleading requirements in securities fraud cases above the requirements of caselaw interpreting Rule 9(b). However, there is considerable disagreement over the nature and extent of the more stringent pleading burden.

▮ The first requirement of the Reform Act is that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The Fifth Circuit has indicated that this statutory language is merely an adoption of the Second Circuit's requirement that plaintiffs in fraud cases

---

1. Taking a different approach semantically, some courts combine the recklessness test and the conscious behavior test into one test labeled the "circumstantial evidence" test. Under this test, the inquiry is whether the plaintiff has alleged facts that constitute strong circumstantial evidence or conscious misbehavior or recklessness. *See, e.g. Rehm,* 954 F.Supp. at 1255.

must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *See Williams*, 112 F.3d at 177–78. Therefore, the pre-Reform Act caselaw regarding the particularity requirements of Rule 9(b) is relevant.

 The second pleading requirement of the Reform Act, addressing the scienter requirement, is somewhat hazy. The statutory language at issue provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

As one district court noted, the Reform Act "does not delineate what facts suffice to establish a 'strong inference' of fraudulent intent. Instead, Congress, in its infinite wisdom, bestowed such duty to interpret upon the courts." *In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192, 200 (E.D.N.Y.1997).

### D. Judicial Interpretation of the Scienter Requirement of the 1995 Reform Act

Federal district courts have reached different conclusions in interpreting the intent of Congress with regard to pleading requirements for the scienter element. The conclusions reached in these cases can be grouped as follows: (1) only the conscious behavior test remains viable; (2) the motive and recklessness tests are still alive; and (3) motive and recklessness facts are at least relevant in looking for a strong inference of fraudulent intent. Ad-

ditionally, some courts have taken hybrid approaches representing various combinations of these conclusions.

### 1. Cases Holding that Only the Conscious Behavior Test Remains Viable

Legislative history of the Reform Act refers to the Second Circuit's pleading requirements prior to the passage of the Act. Under the Second Circuit's standard, a plaintiff was required to "allege specific facts that either (1) constituted circumstantial evidence of either reckless or conscious behavior on the part of the defendant or (2) established defendant's motive to commit fraud and an opportunity to do so." *Norwood*, 959 F.Supp. at 208.

A few courts have held that Congress did not intend to codify the Second Circuit's pleading standard. Additionally, they have held that a plaintiff in private securities litigation must now plead specific facts that give rise to a strong inference of conscious behavior on the part of the defendant. These courts consider inapplicable pre-Reform Act case law related to motive, opportunity and recklessness, and they seem to refuse to even consider motive, opportunity and recklessness facts in determining if the Plaintiffs have pleaded conscious misbehavior. *See In re Silicon Graphics, Inc. Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 99, 325, 1996 WL 664639, *6 (N.D.Cal. Sept. 25, 1996) ("Silicon Graphics I") ("plaintiff must allege specific facts that constitute circumstantial evidence of conscious behavior by defendants") [2]; *Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42, 49 n. 2 (D.Mass.1997) ("In light of the fact that the [Reform Act] has eliminated recklessness, this Court is of the opinion that conscious behavior can now only take the form of circumstantial evidence indicating intent to defraud or knowledge of the falsity."); *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997) (plaintiff must now "plead specific facts

---

**2.** Judge Smith later refined his court's position. *See In Re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 757 (N.D.Cal.1997)

("Silicon Graphics II") (discussed in Section II.D.3., *infra*).

that create a strong inference of knowing misrepresentation on the part of the defendants")[3]; *Voit v. Wonderware Corp.,* 977 F.Supp. 363, 374 (E.D.Penn.1997) (agreeing with *Friedberg* and *Norwood* decisions).

Several reasons have been offered for these conclusions. First, the Conference Committee Report for the Reform Act indicates that Congress did "not intend to codify the Second Circuit's case law interpreting this pleading standard," but rather it intended to "strengthen existing pleading requirements...." H.R.Conf.Rep. 104–369, 104th Cong. 1st Sess. 41 (1995). "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." Id. at 41, n. 23. Several opinions have relied upon all or part of this history in determining that only the conscious behavior test survives. *See Norwood,* 959 F.Supp. at 208; *Silicon Graphics I,* 1996 WL 664639 at *5; *Friedberg,* 959 F.Supp. at 48; *Voit,* 977 F.Supp. at 374.

Second, "when he vetoed the [Reform Act] bill, a veto that Congress overrode, President Clinton stated that it was 'crystal clear' that Congress intended the [Reform Act] 'to raise the [pleading] standard even beyond the [high pleading standard of the Second Circuit].'" *See Norwood,* 959 F.Supp. at 208 (quoting 141 Cong.Rec. H15215–06 (1995)); *see also Silicon Graphics I,* 1996 WL 664639 at *5;.

Third, the Conference Committee rejected language that would have expressly retained the motive and recklessness tests. This language was contained in an Amendment to the Senate Bill considered by the Committee, and it reads as follows:

(b) REQUIRED STATE OF MIND .

(1) IN GENERAL.—In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, specifically allege facts giving rise to a strong inference that the defendant acted with the required state of mind.

(2) STRONG INFERENCE OF FRAUDULENT INTENT.—For purposes of paragraph (1), a strong inference that the defendant acted with the required state of mind may be established either—

(A) by alleging facts to show that the defendant had both *motive and opportunity* to commit fraud; or

(B) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or *recklessness* by the defendant.

141 Cong.Rec. § 9170 (June 27, 1995) (emphasis added).

Several courts have considered the Committee's rejection of this language to be strong evidence that Congress did not intend to leave alive the motive and recklessness tests. *See Friedberg,* 959 F.Supp. at 48–49; *Silicon Graphics I,* 1996 WL 664639 at *5. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it had earlier discarded in favor of other language," *Friedberg,* 959 F.Supp. at 49 (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 442–443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). "The Conference Committee's deletion of the [motive and recklessness tests] from the final bill 'strongly militates against a judgment that Congress intended a result that it expressly declined to enact.'" *Silicon Graphics I,* 1996 WL 664639 at *6. (quoting *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974)).

---

**3.** The *Norwood* opinion was written by Judge Baer from the Southern District of New York. In a later opinion, Judge Baer stated that the pleading of "conscious recklessness" satisfies the requirements of the Reform Act. *See In re Glenayre Tech., Inc. Sec. Litig.,* 982 F.Supp. 294, 298 (S.D.N.Y.1997).

### 2. Cases Holding that Motive, Opportunity and Recklessness Tests Are Still Viable

Other federal district courts have concluded that Congress did not intend for the Reform Act to abolish the motive and recklessness tests. *See Zuckerman v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 623 (N.D.Tex.1998); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1351 (S.D.Cal. 1998); *Page v. Derrickson*, No. 96–842–CIV–T–17C, 1997 WL 148558, at *10 (M.D.Fla. March 25, 1997); *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Shahzad v. Meyers*, No. 95 Civ. 6196, 1997 WL 47817, at *7 n. 6 (S.D.N.Y. Feb. 6, 1997); *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1252–53 (N.D.Ill.1997) [4]; *Fischler v. AmSouth Bancorporation*, No. 96–1567–CIV–T–17A, 1996 WL 686565, at *2–3 (M.D.Fla. Nov. 14, 1996); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1377 (S.D.N.Y.1996); *Zeid v. Kimberley*, 930 F.Supp. 431, 438 (N.D.Cal.1996); *Marksman Partners, L.P. v. Chantal Pharm.*

*Corp.*, 927 F.Supp. 1297, 1310 (C.D.Cal. 1996); *Robertson v. Strassner*, 32 F.Supp.2d 443, 447; *Health Mgmt.*, 970 F.Supp. 192, 200.[5] Some of the courts which apply all three tests clarify that the totality of the allegations must raise a strong inference of fraudulent intent.[6]

The *Marksman* case lists several reasons for reaching the conclusion that the motive, opportunity and recklessness tests remain viable. Speaking only to one of the tests at issue, the court in *Marksman* found that the "legislative history of the [Reform Act] does not indicate that Congress acted to eliminate recklessness as a basis for scienter in actions like the instant one." *Marksman*, 927 F.Supp. at 1309. The court found it persuasive that Reform Act did not expressly abrogate recklessness as a means of pleading scienter. *Id.* at 1309 n. 9. "Legislative silence ... does not give the Court grounds to conclude that recklessness is no longer an adequate basis to establish scienter.. . ." *Id.*[7]

The court in *Marksman* also decided that the motive test is still viable, offering

4. The court in *Rehm* added that the Reform Act "adopts the Second Circuit standard but declines to bind courts to the Second Circuit's interpretation of its standard." 954 F.Supp. at 1252.

5. One court left alive the recklessness test without reaching the issue of whether the motive test is still viable. *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1322 (E.D.Wash. 1998). Another court concluded that although the motive test is dead, the recklessness test remains viable. *Novak v. Kasaks*, 997 F.Supp. 425, 431–32 (S.D.N.Y.1998).

6. *Zuckerman*, 4 F.Supp.2d at 623 (plaintiffs met requirement of Reform Act by "alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating Defendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent"); *STI Classic* at 623. (Plaintiffs meet pleading requirements by "alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating Defendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent."); *Robertson*, 32 F.Supp.2d 443, 447 (Plaintiffs meet require-

ments by "alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating Defendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent."); *Health Mgmt.*, 970 F.Supp. 192, 200 ("Congress intended the courts to determine whether a plaintiff has pled a 'strong inference' of fraudulent intent, by examining the particular allegations of each case. A plaintiff can satisfy this burden by pleading motive and opportunity, conscious misbehavior, recklessness or by impressing upon the court a novel legal theory.").

7. Another court noted that the Securities & Exchange Commission filed an *amicus curiae* brief on a motion for reconsideration in *Silicon Graphics. See Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1471 n. 4 (N.D.Ga.1997). In that brief, the SEC argued that the recklessness test is still viable. *Id.* "Courts have given deference to the views of the SEC in matters relating to the interpretation and enforcement of the federal securities laws." *Id.* (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 239, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

the following reasons. *Id.* at 1310. First, the court reasoned that "the conference committee emphasized that the Second Circuit's pleading standards were the most stringent of any circuit's, and thus it is reasonable to assume that Second Circuit jurisprudence comes closest to approximating the [Reform Act's] new requirements." *Id.*

Second, the court in *Marksman* found unpersuasive the footnote in the Conference Committee Report stating that the Committee chose not to include in the statute language relating to motive, opportunity and recklessness. *Id.* The Court reasoned that this footnote "implies that Congress chose not to codify motive and opportunity as pleading requirements but does not indicate that Congress chose to specifically disapprove the motive and opportunity test." [8] *Id.* at 1311. "The Court has little doubt that when Congress wishes to supplant a judicially-created rule it knows how to do so explicitly, and in the body of the statute." *Id.*

Third, the *Marksman* court found that the motive test is not contrary to Congress' goal of making scienter allegations more difficult to plead. *Id.* "The [motive] test itself is an exacting analysis courts have employed to assess whether the quantum and quality of factual allegations in the complaint, beyond mere allegations that a material misrepresentation occurred, actually create an inference that a defendant acted with an intent to defraud." *Id.* "[T]he fact that Second Circuit courts applying the [motive] test have traditionally done so with the express recognition that the plaintiff's allegations must yield a 'strong' inference of fraudulent intent supports the conclusion that the test is wholly consistent with the [Reform Act's] standard." *Id.*

Fourth, the court in *Marksman* looked to the following language in the report of

the Senate committee that worked on this legislation:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, the Second Circuit requires that the plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

*Id.* (quoting S.Rep. No. 98, 104th Cong., 1st Sess. 15 (1995), U.S.Code Cong. & Admin.News 1995 at 694). This language, the court found, indicates that the pleading standard under the Reform Act is derivative of prior Second Circuit case law. *Id.*

Another federal district court, pointing to the same reasons relied upon in *Marksman,* held that the Reform Act did not eliminate the motive and recklessness tests. *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1252 (N.D.Ill.1997). The court in *Rehm* stated that the Reform Act "does not impose a more rigorous pleading requirement than that enunciated by the Second Circuit." *Id.* Before reaching this conclusion, the court recognized the language in the Conference Committee Report stating that the Committee "intends to strengthen existing pleading requirements" and that the Committee "does not intend to codify the Second Circuit's case law interpreting this pleading standard." *Id.* However, the court was convinced that the fact that "Congress chose not to codify Second Circuit case law does not mean that it specifically chose to disapprove the Second Circuit test." *Id.*

---

**8.** This Court is puzzled by this reasoning. Even in the Second Circuit, pleading motive and opportunity was never a pleading *require-* *ment,* but rather it was one of three ways a plaintiff could properly plead scienter.

### 3. Motive and Opportunity Facts Are at Least Relevant to the Intent Inquiry, and the Recklessness Test Remains Viable.

With a slightly different twist, other courts have explicitly left alive the recklessness test, rejected the pre-Reform Act version of the motive test, but stated that motive and opportunity facts may still be relevant to the intent inquiry. *See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345 (D.Colo. 1998); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1107–08 (D.Nev.1998); *In Re Glenayre Technologies, Inc.*, 982 F.Supp. 294, 298 (S.D.N.Y.1997); *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 241–42 (S.D.N.Y.1997); *Silicon Graphics II*, 970 F.Supp. at 757.[9]

The court in *Queen* stated:

[T]he Reform Act requires that a court examine a plaintiff's allegations in their entirety, without regard to whether those allegations fall within a formalistic category such as motive and opportunity, to determine if the allegations permit a strong inference of fraudulent intent. If the facts alleged permit such an inference than a 10b–5 claim will by the Reform Act's plain language survive a motion to dismiss.

2 F.Supp.2d 1345, 1359.

The court in *Queen* further explained that Congress' intention in passing the Reform Act was to preclude a "per se rule that allegations of motive and opportunity necessarily raise a strong inference that the defendants acted with the required state of mind." *Id.* However, the court explained, "[t]his does not mean that in occasional cases the inference drawn solely from motive and opportunity allegations will not be sufficiently strong to withstand a motion to dismiss, but merely that it will

not always do so." *Id.* (citing *In re Baesa Sec. Litigation*, 969 F.Supp. at 242.) Furthermore, "in those cases where motive and opportunity allegations do not alone create a strong inference of scienter, the allegations will nonetheless be relevant in determining whether the totality of the allegations permits a strong inference of fraud." *Id.*

A similar approach was taken in *Glenayre*: "That 'motive and opportunity' no longer automatically suffices to raise a strong inference of scienter does not mean that facts relating to motive and opportunity are not relevant to the scienter analysis." *Glenayre*, 982 F.Supp. at 298. The court also held that recklessness suffices, but added that "recklessness in this context approximates actual intent, and is not merely a heightened form of negligence." *Id.*

In *Silicon Graphics II*, the court held that the plaintiffs' complaint "must create a strong inference of knowing or intentional misconduct." 970 F.Supp. at 757. The court added that "[k]nowing or intentional misconduct includes *deliberate* recklessness, as described in *Hollinger*." *Id.* (emphasis added). The court was referring to the decision in *Hollinger v. Titan Capital Corporation*, 914 F.2d 1564 (9th Cir.1990), in which the Ninth Circuit defined reckless conduct as:

a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.

*Id.* at 755. This definition is virtually identical to the one used in the Fifth Cir-

---

9. Without explicitly declaring that the recklessness test is still viable, one court determined that the motive, opportunity and recklessness facts may at least be considered in determining if the plaintiffs have raised a strong inference of the defendant's fraudulent

intent. *See OnBank & Trust Co. v. FDIC*, 967 F.Supp. 81, 88 (W.D.N.Y.1997) ("As long as the court applies the [Reform Act] as written, allegations of motive, opportunity, or reckless behavior may still be relevant.").

cuit. *See Lovelace,* 78 F.3d at 1018 n. 2. The court in *Silicon Graphics II* also stated that "motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud." 970 F.Supp. at 757.

### E. This Court's Approach

Agreeing with the majority approach, the Court has determined that scienter may be adequately plead by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Also, the Court agrees with cases holding that motive facts can be considered in determining whether the complaint raises a strong inference of scienter, even though satisfaction of the motive test alone does not conclusively establish an inference of the required state of mind under the Reform Act. *See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345 (D.Colo.1998); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1107–08 (D.Nev.1998); *In Re Glenayre Technologies, Inc.,* 982 F.Supp. 294, 298 (S.D.N.Y.1997); *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 241–42 (S.D.N.Y. 1997); *Silicon Graphics II,* 970 F.Supp. at 757.

Congress would not "abolish the well established use of recklessness as permissible scienter under the securities laws without expressly stating so in the language of the statute." *See Stratosphere,* 1 F.Supp.2d at 1107. The Court also agrees with cases holding that satisfaction of the pre-Reform Act motive test does not auto-matically give rise to a strong inference that the defendant acted with the required state of mind.[10] However, "[t]his does not mean that in occasional cases the inference drawn solely from motive and opportunity allegations will not be sufficiently strong to withstand a motion to dismiss, but merely that it will not always do so." *Queen,* 2 F.Supp.2d at 1359. Finally, even if the recklessness and motive tests are not satisfied, motive and recklessness facts should still be considered in determining if the totality of the allegations gives rise to a strong inference of the defendant's fraudulent intent.

With these legal principles in mind, the Court will now examine the Defendants' motions to dismiss.

### III. BARRICK

■■■ The Plaintiffs contend that Barrick violated the securities laws through its misrepresentations and omissions. In opposing Barrick's motion to dismiss for failure to state a claim, the Plaintiffs point to the following statements allegedly made by Barrick:

(1) "Unable to achieve a friendly deal [with Bre–X regarding a joint venture], Barrick began to develop political ties to enable it to exert political pressure on Bre–X to permit Barrick to gain an interest in Busang. On June 17, 1996, Barrick CEO Munk made a formal presentation to the Indonesian Mines and Energy Minister Ida Bagus Sudjana and other key officials concerning the development of Busang.

---

**10.** The Court is aware of a recent case from the Second Circuit which seems to reach a different conclusion. In a case governed by the Reform Act, the court stated, without discussion, that a plaintiff must either "(a) allege facts to show that defendants had both motive and opportunity to commit fraud or (b) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (quotations omitted). This Court is convinced that it is not enough for a plaintiff to satisfy the pre-Reform Act motive test. Instead, even if the motive test is satisfied, the Court must make the additional determination of whether the alleged facts give rise to a strong inference of fraudulent intent. In practice, this distinction may be largely academic. The Court also notes that the Ninth Circuit has strongly indicated in dicta its belief that Congress intended for the Reform Act to reject the motive test for pleading scienter. *See Maldonado v. Dominguez,* 137 F.3d 1, 10 n. 6 (1st Cir.1998).

According to Barrick's director of corporate communications David Wynn–Jones. 'We told them we had the 1.5 billion dollars to develop the mine, we had the mining expertise—and we could do it fast.... Frankly, I think these were the answers the Indonesians wanted to hear.'" (Second Amended Class Action Complaint ("Complaint"), Dkt. # 207, ¶ 135.)

(2) "On December 5, 1996, Barrick publicly stated that to pay for its interest in Busang, it would offer Bre–X shareholders a package that might include a combination of cash and Barrick stock debentures." (Complaint, ¶ 177.)

(3) "On December 6, 1996, Barrick spokesman Vince Borg confirmed that Barrick was negotiating with Bre–X in good faith and its status as the government proposed joint venture partner of Bre–X had not changed." (Complaint.¶ 179.)

(4) "December 13, 1996, Lehman issued another report, written by McConvey [former comptroller of Barrick], which stated: 'Barrick has said repeatedly that any deal it does with Bre–X would be fair to the shareholders of both companies.'" (Complaint, ¶ 182.)

(5) "December 16, 1996, Barrick reported that it had made a submission with Bre–X to the Indonesian Government indicating that the companies could work together if the Indonesian Government could meet certain requests. In response to this announcement, Barrick's stock price rose C$1.45 to close at C$40.25 per share." (Complaint, ¶ 183.)

(6) "[O]n December 16, 1996, Barrick spokesman Vince Borg was quoted by Reuters as stating that 'Barrick has an established track record of being "fair" in transactions, and the proposed deal with Bre–X would be no different.'" (Complaint, ¶ 184.)

(7) "[O]n December 21, 1996, The Financial Post, reported that former U.S. President George Bush had written a letter to a Bre–X shareholder indicating that investors in Bre–X would be treated fairly by Barrick." (Complaint, ¶ 184.)

(8) "[O]n December 23, 1996, Barrick spokesman Borg was quoted in The Northern Miner, as stating: 'All I can say, in a general sense, is that Barrick has a track record of being fair in these kinds of transactions.'" (Complaint, ¶ 184.)

(9) "On or around January 14, 1997[,] Bre–X issued a press release concerning an unsolicited tender offer by Placer Dome, Inc., received by the Company." (Complaint, ¶ 191.) "Barrick responded by insisting that it had 'reached an agreement with Bre–X within parameters set by the government and that agreement is now before the government.' Placer is floating a trial balloon." (Complaint, ¶ 192.)

(10) "On January 20, 1997, Reuters reported that the Indonesian Government had sent a letter to Barrick and Bre–X stating [that the companies should reach a partnership agreement within one month.]" (Complaint, ¶ 195.) "Barrick characterized the letter publicly as reaffirming the government's support for its participation in developing Busang and that Barrick was moving ahead with the development of the site. For example, on January 21, 1997, Barrick spokesman Borg was quoted by Reuters as stating, 'the main thing here is that the government has reaffirmed its support of Barrick's participation.... This is a very significant step forward.'" (Complaint, ¶ 196.)

(11) "Borg was also quoted on January 22, 1997[,] by the Calgary Herald

as stating. 'We're going to work with Bre–X to finalize the arrangement and we're confident that can be achieved within the time frame' imposed by the Indonesian Government." (Complaint, ¶ 196.)

(12) "Barrick also issued a press release on or about January 22, 1997[,] attributing Barrick's participation in the development of Busang to its reputation for expertise and financial strength. The press release quoted Munk as stating: 'The [Indonesian] support for Barrick's participation reflects our unique development capacities and financial strength. Barrick is the only company that has ever developed an open pit gold mine producing over two million ounces per year.'" (Complaint, ¶ 197.)

(13) "Barrick continued to express publicly its intention to close a deal with Bre–X shortly. On February 4, 1997, Barrick made another offer regarding Busang." (Complaint, ¶ 202.)

(14) "By February 14, 1997, Barrick discontinued its efforts to obtain an interest in Busang. However, Busang did not disclose—and still has not disclosed—its findings based on earlier tests which revealed an absence of gold at Busang, instead, Munk reiterated that Barrick's proposal was 'fair.' For example, the *Extel Examiner* on February 17, 1997[,] quoted Munk as stating: 'We believe our proposal for Busang was fair and equitable to Bre–X and its partners, and provided for significant economic and social benefits for Indonesia. We offered a very good economic deal for all concerned but to go beyond that in the circumstances would not have

been in the best interests of our shareholders.'" (Complaint, ¶ 203.)

## A. Particularity

As detailed in Paragraphs 1 through 14 above, the Plaintiffs have accused Barrick of making various misrepresentations. In many instances, however, the Plaintiffs have failed to make these allegations with the required level of particularity. In Paragraph 1, the Plaintiffs failed to specify the time and place of the alleged misrepresentations.[11] Paragraph 4 does not specify either the identify of the person making the alleged statement or the place it was made. Paragraph 9 fails to specify the identity of the speaker and does not specify the time or place the statement was made. Paragraph 2, 3, 5 and 13 do not specify the place the alleged statements were made.

The remaining paragraphs may also fail to meet the requirements of showing what the speakers obtained by making the statements and of explaining why the statements were fraudulent. However, the Court will give the Plaintiffs the benefit of the doubt at this point, and it will assume that Paragraphs 6, 7, 8, 10–12 and 14 survive the particularity analysis.

## B. Misrepresentation Analysis

 The paragraphs that survive the particularity analysis essentially embody the following alleged misrepresentations: (1) in undertaking a joint venture with Bre–X, Barrick will be fair to the shareholders of Bre–X; (2) the Indonesian government supports Barrick's participation in the Busang project; (3) Barrick is working to finalize an arrangement with Bre–X and Barrick is confident an agreement can be reached within the time frame imposed by the Indonesian Government; (4) Barrick is the only company that has ever developed an open pit gold mine producing over two million ounces per year; (5) the

11. A date was given for Munk's presentation to the Indonesian officials. However, the Plaintiffs apparently are pointing in Paragraph 1 to the alleged statement of Wynn–Jones. For that alleged statement, the Plaintiffs specified neither a time nor a place.

deal Barrick offered Bre–X was a good one.

These statements are not actionable under 10b–5. The Plaintiffs have not shown that these statements were false when they were made. Even considering these statements collectively, they do not create an actionable misrepresentation. Barrick's statements that it would be fair to Bre–X shareholders was not tantamount to a representation that there was gold at Busang. Barrick was saying only that if it struck a deal with Bre–X, that deal would be fair. Barrick's other statements related to its ongoing negotiations with Bre–X are also unactionable.

All of the statements allegedly made by Barrick are of the vague, optimistic type that do not result in a 10b–5 violation. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997) ("[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions"); *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) (investors "rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen"). Barrick's alleged statements "lack the sort of definite positive projections that might require later correction." *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996).

Citing to *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Plaintiffs argue that statements that a transaction is "fair" are actionable. The Court disagrees with the Plaintiffs' broad interpretation of this case. In *Virginia Bankshares*, an investment banking firm gave a Bank's executive committee an opinion that $42 per share would be a fair price for the minority shareholders' stock in a bank. *Id.* at 1088, 111 S.Ct. 2749. The executive committee approved a merger proposal at that price, as did the full board. *Id.* In turn, the directors represented to the mi-

nority shareholders that $42 was a "high" valuation and a "fair" price for the shares. *Id.* One of the issues in this case was whether such statements are actionable under our securities laws. In holding that such statements are actionable, the Court noted:

> In this case, whether $42 was "high," and the proposal "fair" to the minority shareholders, depended on whether provable facts about the Bank's assets, and about actual and potential levels of operation, substantiated a value that was above, below, or more or less at the $42 figures, when assessed in accordance with recognized methods of valuation.

*Id.* at 1094, 111 S.Ct. 2749. Thus, the Court found the statements in that case to be actionable because they were tied to a specific dollar figure, the accuracy of which was subject to quantitative verification. Such is not the case with Barrick's statements, which were never linked to a specific dollar figure. Barrick's statements were of a more vague and unquantified nature. Therefore, *Virginia Bankshares* is not controlling.

Furthermore, the Court is persuaded by Barrick's argument that the instant action against it is similar to the unsuccessful action in *Gordon v. Diagnostek, Inc.*, 812 F.Supp. 57 (E.D.Pa.1993). In *Gordon*, a class of Diagnostek shareholders sued the company based on allegedly inflated earnings reports. Diagnostek's shareholders also attempted to sue Medco, a corporation which had unsuccessfully attempted to acquire Diagnostek. As Barrick correctly notes, the Plaintiffs' allegations against Medco are similar to the allegations against Barrick in this action: "[P]laintiffs' charge Medco with affirmatively misrepresenting Diagnostek's situation by announcing its plan to acquire Diagnostek without stating that this acquisition was 'conditioned' on the accuracy of Diagnostek's reported earnings." *Gordon*, 812 F.Supp. at 59. The court granted Medco's motion to dismiss and stated:

Omitting a "condition" which must have been obvious to any reasonable investor hardly "convey[s] to the public a false impression." No fact-finder could conclude that an investor relied on the "representation" that Medco was going to buy Diagnostek even if it turned out all the underlying valuations of that company were untrue.

*Id.* at 61. Similarly, Barrick was not required to accompany its alleged statements regarding a proposed deal with cautionary language conditioning those statements on the accuracy of Bre–X's representations that there was gold at Busang. Even if Barrick had stated flatly that it definitely intended to fully acquire Bre–X, no reasonable investor could believe that intention would be carried out if the absence of gold at Busang were exposed.

The Plaintiffs also argue that the falsehood of Barrick's statements does not derive from its intention to be "unfair" to Bre–X shareholders, but rather from its use of its statements to further the impression that Busang was the "gold discovery of the century," when Barrick was well aware that its own test results did not support that conclusion. The Plaintiffs' Complaint describes these test results as follows:

> Barrick was given access to 135 waste core samples from Busang, which had not been used for assay testing. Tests demonstrated that of the 135 samples tested, 130 contained no gold. Based on its testing of core samples, Barrick knew that Bre–X's claims about Busang were false. Nevertheless, Barrick issued public statements ... directed to actual and potential shareholders of Bre–X, which lent credibility to Bre–X's false statements about the gold prospect at Busang.

(Complaint, ¶ 157.)

First, the Plaintiffs fail to allege when Barrick conducted these tests. Thus, this allegation may face particularity requirement problems. However, even if the Court were to assume that the tests were conducted before Barrick made any statements, the Plaintiffs have failed in other respects to support their theory.

In order for the Plaintiffs' theory to survive this motion to dismiss, the allegations in the complaint must give rise to a reasonable inference that Barrick's awareness of these negative test results is equivalent to Barrick's learning definitively or recklessly disregarding the fact that there was no gold at Busang. Such an inferential leap is not supported by the Complaint. How conclusive was this test? Did this one round of negative tests represent the entire universe of information available to Barrick, or was it overwhelmed by ten other positive tests? Did the negative test results only involve core samples from a limited area of Busang, or did the samples purport to represent the entire area? What is the significance of the fact that 5 of the samples were not negative? Without more facts from which to draw reasonable inferences, the Court finds that the Plaintiffs have failed to identify actionable misstatements of Barrick.

### C. Omission Analysis

The Plaintiffs also allege that during the fall of 1996 Barrick conducted "due diligence" in connection with the proposed joint venture to develop Busang. As noted above, the Plaintiffs' Complaint describes this effort as follows:

> Barrick was given access to 135 waste core samples from Busang, which had not been used for assay testing. Tests demonstrated that of the 135 samples tested, 130 contained no gold. Based on its testing of core samples, Barrick knew that Bre–X's claims about Busang were false. Nevertheless, Barrick issued public statements ... directed to actual and potential shareholders of Bre–X, which lent credibility to Bre–X's false statements about the gold prospect at Busang.

(Complaint, ¶ 157.) Barrick's failure to disclose these test results, the Plaintiffs

argue, amounts to an omission which violated 10b–5.

As a threshold matter, the key inquiry at this point is whether Barrick had a duty to disclose the negative test results to Bre–X shareholders. The Plaintiffs contend that by choosing to make the statements listed in Paragraphs 1–14 above, Barrick took on a duty of disclosure. Barrick argues that it had no duty to speak to Bre–X shareholders.

█ Silence is actionable under federal securities laws only if the defendant had a duty to speak. *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("there can be no fraud absent a duty to speak"); *Basic v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). The "mere possession of nonpublic market information" does not give rise to a duty to disclose. *Chiarella,* 445 U.S. at 235, 100 S.Ct. 1108. Also, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993).

█ The Plaintiffs contend that Barrick, by publicly stating that it was negotiating with Bre–X and that it would be fair to Bre–X shareholders, took on a duty to disclose any material information related to the Busang project that it acquired thereafter. In support of this contention, the Plaintiffs point to the Fifth Circuit's statement that "a duty to speak the full truth arises when a defendant undertakes to say anything." *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977). However, this rule is not as absolute as one might gather after reading *First Virginia Bankshares.* The Fifth Circuit most likely would agree that a more precise statement of the rule is that a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject.*

In *Gordon,* Medco announced that it would acquire Diagnostek in a stock swap. *Gordon,* 812 F.Supp. at 59. Before the deal was done, Diagnostek disclosed that it had made accounting error which had caused it to inflate an earnings report. *Id.* On the same day Diagnostek made that disclosure, Medco publicly stating that it was reconsidering the proposed stock swap. *Id.* Two days later, Medco announced that the acquisition was off. *Id.* The plaintiffs sued Medco for, *inter alia,* failing to disclose the accounting error. *Id.*

█ Even though Medco made three public statements regarding the deal, the court found that Medco had no duty to disclose the accounting error. *Id.* Similarly, even though Barrick made several public statements that it was negotiating with Bre–X and that it would be fair to Bre–X shareholders, it had no duty to disclose the negative test results. Such a duty would have arisen had Barrick said something to the effect of "we know there is gold at Busang, and we will be fair to Bre–X shareholders in attempting to get in on the action," or "we have done our own testing and it looks like there is gold there." In the absence of such statements on the existence of gold at Busang, Barrick was under no duty to disclose the negative test results.

### D. Scienter Analysis

█ Additionally, the Plaintiffs have not alleged facts sufficient to support a strong inference of Barrick's fraudulent intent. As explained above, the Plaintiffs have not pleaded facts which give rise to a reasonable inference that Barrick's knowledge of the negative test results is equivalent to Barrick's knowing there was no gold at Busang. Thus, the Plaintiffs have not pleaded conscious misbehavior on the part of Barrick. Also, because the Plaintiffs have failed to allege facts indicating that Barrick's actions involved an "extreme departure from standard of ordinary care,"

*see Lovelace*, 78 F.3d at 1018 n. 2. they have failed to adequately plead recklessness.

Finally, the Plaintiffs have not alleged an adequate motive to satisfy the motive test. The Plaintiffs allege that Barrick intended to inflate the market price of its stock. However, such an allegation is clearly insufficient. *See Tuchman*, 14 F.3d at 1068; *see also Salinger v. Projectavision, Inc.*, 972 F.Supp. 222 (S.D.N.Y. 1997) ("It is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price."). The Plaintiffs also argue they satisfied the motive test by alleging that Barrick was in need of additional gold reserves. This argument seems illogical to the Court. How could Barrick hope to acquire additional gold reserves by touting its efforts to get involved in the Busang development, when, according to the Plaintiffs, Barrick knew all along there was no gold there? If the Plaintiffs are aware of additional facts that would shed some light on this issue, they should include them their new complaint.

The Plaintiffs have failed to adequately state a claim against Barrick. Thus, the Plaintiffs' action against Barrick is dismissed without prejudice.

## IV. LEHMAN

Beginning November 16, 1996, Lehman issued a series of analyst reports on Bre–X. In these reports, Lehman rated Bre–X stock and made positive statements regarding Bre–X and the Busang site. Some of the reports also contained certain cautionary language. The Plaintiffs contend that the positive statements contained in these reports, as well as Lehman's failure to disclose certain negative information about Busang, give rise to Lehman's liability under 10b–5.

Rather than list all of the statements at issue, the Court will begin by analyzing the ones most likely to be actionable. The following paragraphs contain quotes, both positive and cautionary in nature, pulled from Lehman analyst reports on Bre–X.[12] Lehman's rating of Bre–X stock and its target price as listed in the reports are also noted. The dates listed on the side indicate the dates the reports were issued.

11/18/96 [13] Stock rating: 3–Neutral

Target price: $16

"[Bre–X stock is] high risk [and is] sure to see high volatility during the coming weeks."

"It is early and there is a lot of drilling and ore body interpretation that has to be done which could ultimately put us at risk of being wrong. But Bre–X's recent Busang discovery ... had, so far, had every indication of becoming the gold discovery of the century. One would have to go back to the Klondike or the discovery of the Witwatersrand in South Africa a century ago to find anything that compares to the apparent size of Busang. In five years, Busang may be the largest producing gold mine in the world."

11/21/96 [14] Stock rating: 1–Buy

Target price: $22

"BRE–X TAKEOVER MAY BE IMMINENT. BUY THIS STOCK TODAY."

"Based on Bre–X's tremendous reserves, we believe that a [C]$28–[C]$30 share price is supportable."

12. In their Complaint, the Plaintiffs list certain statements contained in Lehman Brothers' analyst reports. In its motion to dismiss, Lehman Brothers points to other statements contained in those reports but not identified by the Plaintiffs. Because the Plaintiffs rely on the reports in attempting to establish their claims, the Court is free to consider the entirety of the reports without converting the motion into one for summary judgment. *See Pension Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993) ("court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claim are based on the document").

13. Complaint ¶ 162; Memorandum of Law in Support of Motion of Lehman Brothers Inc. to Dismiss Amended Class Action Complaint, or in the Alternative, for Change of Venue. Docket # 48, filed Nov. 21, 1997 ("Lehman's Memo."). Exh. A.

14. Complaint ¶ 163; Lehman's Memo., Exh. B.

"[U]ncertainty relating to Bre–X [may] carry over for several days which would depress it[s] share price.... [T]here is still risk·in this stock."

"[T]his remains an investment with risk. Not everything Bre–X has done administratively in Indonesia has been orderly.... In a worst case scenario, the Indonesian government could strip Bre–X of all ownership in the project. We think this would be extremely unlikely, but not impossible."

11/22/96 [15] Stock rating: 1–Buy

Target price: $21

"We believe chances are good that Bre–X will likely be taken over by a major mining company, subject to due diligence, sometime in the next few weeks."

"We believe that the ultimate price for an acquisition of Bre–X will be in the $[C]27–[C]$30 range."

11/26/96 [16] Stock rating: 1–Buy

Target price: $20

"[Busang] is a fabulous deposit and it deserves appropriate compensation."

11/27/96 [17] Stock rating: 1–Buy

Target price: $20

"[Bre–X stock] is not a share for the 'faint of heart' and it may drop in price today but, on balance, we are reasonably convinced it will go up in the weeks ahead. Buy the stock on weakness."

"Bre–X has likely found the gold discovery of the century."

"Bre–X has been, in our view, somewhat inept in dealing with a lot of its challenges. This is understandable given Bre–X was, not long ago, a junior exploration company.... However .... Bre–X has not, in our view, done anything seriously wrong."

12/3/96 [18] "Although the stakes may be up, Barrick is still, we believe in the driver's seat to reach a deal with Bre–X. It has done its homework well...."

12/4/96 [19] Stock rating: 1–Buy

Target price: $21

"We believe the [negotiations with Barrick] will be resolved favorably for Bre–X shareholders and that there is 50% upside from current share prices. This stock is risky but for those who can accept high risk we continue to recommend buying Bre–X on weakness."

1/13/97 [20] Stock rating: 1–Buy

Target price: $19

"On Friday, Bre–X announced its best drill hole yet...."
"The spectacular drill results are a reminder of what makes this discover[y] so unique. The above discussed hole ... indicates high grade mineralization going right from the surface."

2/20/97 [21] Stock rating: 3–Neutral

Target price: $18

"John Felderhof, Bre–X's Vice Chairman and de facto Chief Geologist[,] believes that he can prove up 200 million ounces (Bre–X's share 90 million) of gold reserves over the next year. We believe he means it."

3/14/97 [22] Stock rating: 2–Outperform

Target price: $16

"The size and richness of Busang continue to look better every month.

"Investors must remember it is quite possible that Busang may end up possessing more gold (and much more profitable gold) than is currently known to exist in the entire state of Nevada."

3/20/97 [23] Stock rating: 2–Outperform

Target price: $16

"The Death [sic] of Senior Bre–X Geologist, Michael De [sic] Guzman who fell from a helicopter yesterday over Kali-

**15.** Complaint ¶ 164; Lehman's Memo., Exh. C.

**16.** Complaint ¶ 167; Lehman's Memo., Exh. D.

**17.** Complaint ¶ 166; Lehman's Memo., Exh. E.

**18.** Complaint ¶ 173; Lehman's Memo., Exh. G. This report was on Placer Dome, a company that competed with Barrick for acquiring an interest in Busang. Accordingly, the report did not contain a rating for Bre–X stock.

**19.** Complaint ¶ 174; Lehman's Memo., Exh. J.

**20.** Complaint ¶ 190; Lehman's Memo., Exh. P.

**21.** Complaint ¶ 208; Lehman's Memo., Exh. Y.

**22.** Complaint ¶ 212; Lehman's Memo., Exh. Z.

**23.** Complaint ¶ 214; Lehman's Memo., Exh. AA.

mantan may raise questions as to the integrity of the geological data relating to the Busang gold resource."

"We are not overly concerned. While we are not geologists, everything we have seen and heard makes us believe that the work done in determination of the resource was done in a respectable way."

3/24/97 [24] Stock rating: 3–Neutral

Target price: $16

"[An article in a Indonesia paper quoted an 'unnamed source' at Bre–X's Indonesian partner company] as saying that according to an internal Freeport report that it had seen, Freeport believes that there is far less than the 70 million ounce reserve that Bre–X has quoted and that the deposit may not be economic. While such a shocking conclusion seems unlikely in only 3 weeks of due diligence and the report could not be confirmed, it was disconcerting."

"Until we hear substantive news to the contrary, we will continue on the premise that Busang contains more than 70 million ounces of gold. However, we cannot take [this article and the reports of de Guzman's death] without being concerned. . . ."

"Those avoiding high risk should sell."

"[W]hile shaken and wondering what in the world is going on, we believe the deposit exists. We believe that John Felderhof and his team are solid[,] knowledgeable and honorable professionals. The assay lab techniques being used, while not common place, have been looked at and reviewed by knowledgeable professionals. Kilborn has reviewed the procedures. JP Morgan, Bre–X's Investment Bankers have, we understand, reviewed the procedures and Barrick Gold . . . has done its own checks. No one has, to our knowledge, questioned the premise of the deposit to date."

The Plaintiffs allege that Lehman made these positive statements regarding the Busang deposit, even though it knew there were no significant amounts of gold there. At a minimum, the Plaintiffs urge, Lehman recklessly disregarded information indicating an absence of gold.

## A. Particularity Requirements

The Plaintiffs have met the particularity requirements of Rule 9(b) with regard to Lehman's alleged statements. *See Williams,* 112 F.3d at 177. They specified in their Complaint the "time, place and contents" of Lehman's statements at issue, and they adequately specified the identify of the person making the statements. In fact, the Complaint points to specific reports which contain the alleged misstatements. This is sufficient to get the Plaintiffs over the particularity hurdle. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979) (finding that complaint satisfied Rule 9(b) by referring to specific dated documents).

At the front end, the Court must dispense with the argument of Lehman that it merely reported statements of Bre–X regarding Busang as opposed to making its own statements. The Lehman reports sometimes used tentative and cautionary language, but it did not always state that its positive statements regarding Busang were merely restatements of Bre–X reports, or even that Lehman's positive statements were based upon unverified Bre–X information. For example, in its November 21, 1996, report, Lehman stated: "Based on Bre–X's tremendous reserves, we believe that a[C]$28–[C]$30 share price is supportable." This is an unqualified representation made by Lehman that Bre–X had tremendous reserves. Also, on November 26, 1996, Lehman stated: "[Busang] is a fabulous deposit and it deserves appropriate compensation." Furthermore, Lehman vouched for the credibility of Bre–X's reports by, for example, stating in its March 20, 1997, report: "While we are not geologists, everything

**24.** Complaint ¶ 220; Lehman's Memo., Exh. BB.

we have seen and heard makes us believe that the work done in determination of the resource was done in a respectable way."

In short, Lehman represented that there was gold at Busang. The question is whether Lehman knew or recklessly disregarded the fact that there was no gold there. The Plaintiffs argue that Lehman learned of the absence of gold in two ways: however, the Plaintiffs' contentions in this regard fail on particularity grounds. First, they argue that Daniel R. McConvey, the author of Lehman's analyst reports, was provided access to Barrick's negative test results.[25] (Complaint ¶ 158). As explained above, the Court, without more information, cannot equate knowledge of these test results with knowledge that there was no gold at Busang.

Furthermore, the Plaintiffs failed to make the allegation regarding McConvey's knowledge of the test results with sufficient particularity. The Plaintiffs do not specify when and how McConvey learned of the test results. Therefore, the Plaintiffs' allegation that Lehman's statements were false in light of McConvey's knowledge of the test results does not pass muster under the stringent pleading requirements for this action. See Oak Tech. Sec. Litig., No. 96–20552 SW, 1997 WL 448168, at *5 (N.D.Cal. Aug. 1, 1997) (insufficient for plaintiffs to merely allege that defendants made certain representations even though they were aware of contrary adverse information; plaintiffs must provide supporting contemporaneous factual allegations, including allegations of when defendants learned of adverse information).

The Plaintiffs also allege that Lehman learned there was no gold at Busang through a visit McConvey made to Busang. The Plaintiffs allege that McConvey "visited Busang in June or July of 1996 and had access to [Bre–X's] engineers, assayers, and other employees and contractors, where he learned or recklessly disregarded the fact that Bre–X was violating gold

mining industry standards and customs." (Complaint ¶ 65).

The Plaintiffs' allegations do not create a strong inference of Lehman's fraudulent intent. It is not reasonable to conclude that McConvey, a financial analyst, learned or recklessly disregarded during his visit the fact that there was no gold at Busang. The Plaintiffs must allege in more detail to what McConvey was made privy. What tests did McConvey observe Bre–X perform and how did those test depart so far from accepted practices that McConvey knew or recklessly disregarded the fact that the entire project was a hoax? See Silicon Graphics I, at *12 (not enough for plaintiffs to allege access to inside information; plaintiffs must specifically identify the timing and substance of the information at issue). Also, the Plaintiffs must state not only what they believe McConvey saw at Busang, but they must also state with particularity the facts on which that belief is based. How do the Plaintiffs know what McConvey saw and was made privy to at Busang? See Crystal v. Foy, 562 F.Supp. 422, 429 (S.D.N.Y.1983) (plaintiff must provide facts supporting belief that defendants knew of adverse facts).

The Plaintiffs have failed to alleged with sufficient particularity why Lehman knew or recklessly disregarded the fact that there was no gold at Busang. Therefore, the Plaintiffs have failed to adequately state a claim against Lehman, and the Plaintiffs' claims against this Defendant are dismissed without prejudice.

## V. NESBITT BURNS

■ The allegations against Nesbitt are similar to those the Plaintiffs make against Lehman. The Plaintiffs allege that Nesbitt made a series of positive statements regarding the presence of gold at Busang. The question is whether the Plaintiffs have adequately pleaded facts from which one can infer that Nesbitt knew or recklessly disregarded facts indi-

25. McConvey was Barrick's comptroller for six years prior to joining Lehman.

cating the absence of gold. The Complaint alleges the following:

1. "[Egizio] Bianchini [a Nesbitt analyst] visited the Busang drill site and was in constant communication with and closely associated with Bre–X, Bresea, and its top officers. As a result, Nesbitt Burns knew that verified core samples from the Busang site had never been independently collected and independently tested, and knew that statements made by Bre–X, Bresea, and the Kilborn Defendants lacked any legitimate basis." (Complaint, ¶ 12).

2. "Bianchini specializes in analysis and recommendation of the stocks of gold-mining companies. For much of the Class Period, Bianchini was recognized as Canada's top-ranked gold analyst. Considered one of Bre–X's most ardent and influential cheerleaders, Bianchini was credited with giving Bre–X its initial credibility and luster beginning as early as September 1995 when Bianchini first issued a 'buy' recommendation for Bre–X common stock. In part due to his constant and enduring hype of Bre–X stock, Bianchini was given unparalleled access to Bre–X management and the remote Busang site. Starting in late 1995, Bianchini personally visited the site on several occasions, talking with Bre–X geologists and observing the procedures used at the assay lab where the tests on Busang core samples were conducted. Bianchini was given a private tour of the Busang site by Bre–X's lead geologists, Felderhof and the deceased Michael de Guzman, and he made a videotape during one visit. He became such a favorite of Bre–X that his research reports were often posted on Bre–X's internet [sic] site. Bianchini's reports and recommendations were so glowing that Bre–X began to refer to one portion of the Busang site, purportedly containing significant gold mineralization, as 'the Bianchini zone.'" (Complaint, ¶ 58).

3. "On April 12, 1997, it was disclosed that a Nesbitt Burns analyst, while on a trip to Busang, had filmed Bre–X employee during operations at the base camp, including crushing, pulverizing, and homogenizing ore samples at the Company's sample preparation facility before the samples were tested." (Complaint, ¶ 238).

Again, the Plaintiffs have failed to particularize these allegations. In repleading, the Plaintiffs should take guidance from the Lehman analysis above. In short, there is no explanation of how the Plaintiffs learned of what they allege regarding Bianchini and his visit to Busang. For example, Paragraph 3 immediately above would go along way toward helping the Plaintiffs state a claim if it had been pleaded with sufficient particularity. The Plaintiffs just state "it was disclosed" without explaining by whom, to whom, and so forth. For these reasons, the Plaintiffs' Complaint against Nesbitt is dismissed without prejudice.

## VI. J.P. MORGAN

According to the Plaintiffs' Complaint, J.P. Morgan began acting as Bre–X's financial advisor in September 1996.[26] The Plaintiffs allege that J.P. Morgan "made public statements touting the gold resources at the Busang site" even though it knew or recklessly disregarded the fact that there was no gold there. (Complaint, ¶ 8).

26. J.P. Morgan describes it role as follows: "For a few months in late 1996 and early 1997, [J.P. Morgan] acted as financial advisor to Bre–X for the sole purpose of assisting it in negotiating the terms of a joint venture with a major mining company to develop the gold mine at Busang." (Memorandum of Law in Support of J.P. Morgan Securities, Inc.'s Motion to Dismiss, at 1, Dkt. # 45, Nov. 21, 1997).

### A. Newspaper Quote

The Plaintiffs' Complaint alleges that David Neuhaus, a J.P. Morgan analyst, was quoted in *The Financial Post* as saying, "I'd say 150 million ounces is a conservative guess as to what Bre–X will ultimately come up with." (Complaint, ¶ 141). He allegedly made this statement after returning from a tour of the Busang site.

J.P. Morgan argues that the remark could not have been reasonably relied upon by an investor. It was not a representation of fact, J.P. Morgan argues, but only a "guess" as to what Bre–X "will come up with." The Court disagrees. A reasonable investor could have interpreted this statements as follows: "There is gold at Busang, and 150 ounces is a conservative guess as to the exact amount." This statement is clearly actionable if the other elements of the 10b–5 claim are satisfied.

### B. Conference Call Statements

The Plaintiffs' Complaint describes a February 17, 1997, conference call with David Walsh (Bre–X's CEO), analysts and reporters. During the call, Doug McIntosh, a J.P. Morgan investment banker, allegedly made the following statements, which the Plaintiffs contend were false and misleading:

1. "We expect the cash costs [of production] to be significantly less than the $96/ounce estimate in the [November 1996] Kilborn intermediate feasibility study."

2. "[T]he resources are estimated to be 71 million ounces." [27]

3. "The metallurgy at Busang is relatively simply because of the nature of the assaying being cyanide soluble values rather than total gold. We expect metallurgical recovery to be in excess of 95% of contained gold. Over ½ of the gold will probably be recovered in a gravity circuit quite inexpensively and efficiently."

4. "I think you are looking at more or less North American costs of mining . . . I'd say something well below $1 a tonne."

5. "[T]here shouldn't be much variability [in mining costs] through time. What we're seeing is pretty consistent [ore] grade."

6. "If you look at the cash flows of this [project], it pays off at any reasonable gold price [and even at] unreasonably low prices. In a period of time which is way, way shorter than any mining project I've ever seen, the margins are so huge that it is relatively insensitive to either higher costs or lower gold prices. . . . [The project] clearly kicks off a lot of cash flow."

(Complaint, ¶ 206).

The Court agrees with the Plaintiffs' contention that a reasonable investor could have considered these statements as a representation of J.P. Morgan that there was gold at Busang. The question is whether the Plaintiffs have adequately pleaded facts from which the Court can infer that J.P. Morgan knew of or recklessly disregarded facts to the contrary.

### C. Allegations of J.P. Morgan's Knowledge of Adverse Facts

The Plaintiffs argue that J.P. Morgan knew or recklessly disregarded that fact that its statements in *The Financial Post* and during the conference call were false. The Plaintiffs' allege that J.P. Morgan learned of or recklessly disregarded the fact that there was no gold at the site in two ways. First, the Plaintiffs allege that Neuhaus and McIntosh, the J.P. Morgan analysts, paid several visit to Busang. These visits are described in the Complaint as follows:

27. The Plaintiffs omit a portion of this statement. According to a transcript of the conference call filed by J.P. Morgan, the entire statement was as follows: "As had been disclosed [by Bre–X] this week, the resources are estimated to be 71 million ounces . . . ."

1. "J.P. Morgan, acting through its agents, including David Neuhaus and Doug McIntosh, who were both trained geologists and/or engineers, visited the Busang drill site...." (Complaint, ¶ 8).

2. "J.P. Morgan's duty of disclosure and liability derives from ... its knowledge obtained through ... visits to Busang where its agents Neuhaus, McIntosh, and Morrison learned that Bre–X was violating customary gold mining industry standards." (Complaint, ¶ 48).

3. "According to *The Financial Post*, on July 23, 1996, David Neuhaus, a J.P. Morgan analyst who had just returned from a tour of the Busang site, state that Busang could easily contain 150 million ounces of gold." (Complaint, ¶ 141).

Essentially, the Plaintiffs are stating that it is their belief that the J.P. Morgan analyst learned or recklessly disregarded during these visits the fact that there was no gold at Busang. However, the Plaintiffs have not stated with particularity the facts on which this belief is based. They have not even specified the dates on which these visits occurred. How do the Plaintiffs know about these visits and what went on during them? Also, the Plaintiffs have not sufficiently alleged facts from which the Court can that the "red flags"[28] were visible to the J.P. Morgan analysts during their visits.

The Plaintiffs also allege that "Neuhaus was given an actual core sample from Busang. When the sample was independently tested it revealed no traces of gold." (Compliant, ¶ 141). Again, there is no allegation as to when the sample was given to Neuhaus and as to when the independent testing was done.

The Plaintiffs also allege that J.P. Morgan learned of the absence of gold through reviewing and analyzing the internal studies prepared by Kilborn. The Complaint alleges that "[J.P. Morgan] reviewed prefeasibility and feasibility studies prepared by Kilborn, engineering consultants for Bre–X...." (Complaint, ¶ 8). As a threshold matter, the Plaintiffs do not explain how they know J.P. Morgan did this. Additionally, it is not reasonable to infer that J.P. Morgan, after reading these reports, must have learned or should have at least been suspicious that there were problems. In fact, other sections of the Complaint allege that these studies failed to disclose material facts from which one could conclude that there was no gold. Thus, it is not reasonable to conclude that by reading these studies. J.P. Morgan learned there was no gold at Busang. It is also not reasonable conclude that J.P. Morgan acted recklessly in not coming to such a conclusion after reading these studies.

### D. Scienter

The Plaintiffs have failed to alleged with sufficient particularity that J.P. Morgan knew or recklessly disregarded the fact that there was no gold at Busang. The Plaintiffs have also failed to allege sufficient motive on the part of this Defendant. The Plaintiffs essentially allege that J.P. Morgan was motivated by its desire to ingratiate itself with Bre–X, to collect professional fees for its advisory position, and to enhance its business reputation. The allegations are insufficient to satisfy the motive test. Similar motive allegations were rejected as insufficient in *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir.1994). Therefore, the Plaintiffs have failed to adequately state a claim against J.P. Morgan, and the Plaintiffs' claims against this Defendant are dismissed without prejudice.

### VII. KILBORN DEFENDANTS

According to the Plaintiffs' Complaint, P.T. Kilborn and Kilborn Engineering per-

---

**28.** Elsewhere in the Complaint, the Plaintiffs list several "red flags" regarding the testing procedures at Busang. Allegedly, these "red flags" should have indicated to a trained observer that there was no gold at Busang.

formed geostatistical analyses and mine feasibility studies of the Busang site for Bre–X. (Complaint, ¶¶ 50, 51). With regard to SNC, the Plaintiffs allege only that it is the ultimate parent company of Kilborn Engineering. (Complaint.¶ 52). The Complaint makes the following allegations against the Kilborn Defendants:

1. The Kilborn Defendants intentionally withheld critical information from their reports: most importantly, that independent testing performed by other laboratories, pursuant to Kilborn feasibility studies and prefeasibility studies in 1995 and 1996, indicated that the gold appearing in Bre–X's samples was completely different, in shape, size and degree of weathering, from gold that would be found in volcanic hard-rock formation like Busang; and that tests performed by independent firms revealed that the gold in the Bre–X samples was of an origin that was not the underground hard-rock source in Busang. The Kilborn Defendants also intentionally withheld either knowledge that Bre–X's core samples had been crushed on site in Busang, rather than being sent whole to test labs, and had languished for weeks in open bags at the Bre–X office in Samarinda and in an open warehouse in Loa Duri, Indonesia, leaving the samples susceptible to the tampering that obviously occurred. (Complaint, at ¶ 9).

2. [T]he Kilborn Defendants provided their written resource reports to Bre–X, knowing that Bre–X and Bresea were distributing those reports and their contents to the investing public, during the Class Period. The Kilborn Defendants knew or recklessly disregarded that the reports were materially false and misleading, including because they concealed material facts as described herein. The Kilborn Defendants intentionally misrepresented and/or failed to disclose: (a) that the gold purportedly found in Bre–X's samples was not of the shape, size and/or unweathered state of gold indigenous to volcanic hard-rock deposits, which was the type purportedly found in Busang; (b) that after Bre–X's samples were extracted they sat for weeks unsupervised at the Bre–X offices in Samarinda and in open bags in a warehouse in Loa Duri, Indonesia, thereby compromising the security and integrity of the samples; and (c) that when Kilborn finally sent samples for independent mineralogical studies in 1995 and 1996, to Normet, Pty. Ltd. (in Australia), Hazen Research Inc. (in Colorado), and Roger Townsend & Associates (in Australia), it did not reveal or disclose the results, which, among other findings, showed that the gold extracted from the Bre–X samples did not have the geological characteristics that would be evident if the gold had actually been extracted from the Busang site. (Complaint, ¶ 53).

3. The Kilborn Defendants' duty of disclosure and liability derives from, among other things, their knowledge that Bre–X and Bresea were distributing the assay studies and methodologies of the Kilborn Defendants to the investing public and that investors would be relying on the statements made therein when purchasing and selling Bre–X and Bresea stock. The Kilborn Defendants intended to and did profit from their association with Bre–X and believed that their business would benefit because of, among other reasons, investors' access to their statements and reports regarding Bre–X and the potential for further business from Bre–X. (Complaint, ¶ 54).

4. On or about August 14, 1995, Bre–X engaged Kilborn to perform resource calculations and mining feasibility studies for Busang. In all subsequent resource calculations announcements, Bre–X specifically identified Kilborn, with Kilborn's full knowledge, cooperation, and consent, as the party performing the calculations. (Complaint, ¶ 97).

5. When the Kilborn Defendants finally sent samples of ore purportedly extracted by Bre–X from Busang for independent mineralogical studies in 1995 and 1996, to Normet, Pty. Ltd. (in Australia), Hazen Research Inc. (in Colorado), and Roger Townsend & Associates (in Australia), it did not reveal or disclose the results, which were inconsistent with the geological nature of the purported Busang deposit. According to Strathcona[29] (after the Class Period). "Although one could expect to see such exceptional recoveries in a gravity circuit for material coming from an alluvial deposit, we have never before seen such a response for material coming from a primary deposit [such as Busang was represented to be]." These reports were not disclosed to the public by the defendants. (Complaint, ¶ 98(c)) (footnote added).

6. The gold found in Bre–X's samples was alluvial in nature, not from a primary deposit. Thus, for example, the gold was mainly in grains 0.1 to 0.4 mm in diameter. Gold from volcanic hard-rock deposits— like the type that would have been found in Busang—is usually much smaller. Furthermore, the gold which Bre–X purportedly discovered did not have a wiry or fibrous shape typical of volcanic hard-rock deposits, but was round, beaded and oxidized, suggesting that the grains had been abraded and weathered. Round, beaded and weathered gold is usually found in streams. According to Strathcona (after the Class Period), "[w]ith the very coarse liberated gold of up to 400 microns in this study, one would have expected to see visible gold somewhere in the many thousands of meters of drill core from Busang. However, there is no mention of visible gold in any of the documentation that we have seen with the Kilborn feasibility study or resource estimate, or in the drill logs prepared by Bre–X geologists, other than in the mineralogical studies done on the concentrate samples." (Complaint, ¶ 98(d)).

7. No gold was found in unadulterated samples. As stated in a comprehensive petrographic report prepared for Bre–X and Kilborn Defendants in 1996 be PetraScience Consultants Inc. ("PetraScience") of Vancouver, Canada, in which PetraScience reviewed the characteristics of alteration and mineralization from 103 samples from Busang. "Gold is assumed to occur dominantly as free grains," but "no unequivocal gold was observed in this study, either as grains or in other studies." This study was not disclosed by defendants to the public. Commenting on this study after the Class Period. Strathcona stated that: "It is again remarkable that in a deposit

**29.** According to the Plaintiffs' Complaint, Strathcona Mineral Services Limited was an independent engineering firm retained during the final weeks of the Class Period. The Plaintiffs alleged that Strathcona reported that "there was virtually no possibility of an economic gold deposit in ... Busang property" and "the gold recovered in samples by Bre–X has originated from a source other than the Southeast Zone of the Busang Property" and "resulted in falsification of many thousands of samples." (Complaint, ¶ 91) (some quotations omitted).

where so much coarse gold has been observed in samples submitted for assaying that none was observed in the 103 samples that were selected to represent the full range of rock types and associated alteration in the Busang deposit." (Complaint, ¶ 98(e)).

8. On or about February 20, 1996, Bre–X announced an updated resource calculation, including an initial calculation by the Kilborn Defendants for the Southeast Zone, pegging the total indicated and inferred gold resource for Busang at over 15 million ounces. According to Bre–X, "[g]eostatistical analyses and resource calculations for the Southeast Zone 1 ... confirmed and outlined significant mineralization." These results, as calculated by the Kilborn defendants, were represented to be based on accepted geological principles, as issued by the U.S. Bureau of Mines and the U.S. Geological Survey. Company officials continued to state publicly that 30 million ounces of gold were readily attainable. (Complaint, ¶ 116).

9. [In a March 28, 1996, press release, Felderhof] represented that the assay methods employed by Bre–X actually *understated* the resources present: "In addition, metallurgical testwork conducted by internationally recognized Kilborn Engineering, as part of their recently completed prefeasibility study on Busang, resulted in their determining that Bre–X's current and previously reported gold assay results are in fact understated by as much as 12.9%." (Complaint, ¶ 122) (emphasis in original).

10. On April 17, 1996, Walsh announced that "an initial resource calculations had been completed by the Kilborn Defendants on certain sections of Busang, which indicated that there were an additional 9.16 million ounces of gold resource. The press release also announced a resource calculation for two section of the Southeast Zone. Based on the calculation, Busang contained a total of 24.87 million ounces of gold, a 60 percent increase over the previous estimate." (Complaint, ¶ 126).

11. A press release dated June 20, 1996, titled "Bre–X Minerals Ltd.... Announces A 14 Million Ounce Increase In The Busang Gold Project Southeast Zone I Resource Calculation," stated that "as a result of additional tests conducted by the Kilborn Defendants, there were 39.15 million ounces of gold residing at Busang." (Complaint ¶ , 137).

12. Just one month later, a press dated July 22, 1996, titled "Bre–X Minerals Ltd.... Announces A 7.77 Million Ounce Increase In The Busang Gold Project Southeast Zone I Resource Calculation," bullishly stated that "as a result of additional calculations conducted by the Kilborn Defendants, there were 46.92 million ounces of gold in Busang." (Complaint, ¶ 139).

13. "[A Nesbitt report dated July 23, 1996, stated that a 62 million ounce] resource estimate was done by Kilborn SNC Lavalin...." (Complaint, ¶ 140).

14. [On or around August 28, 1996, Bre–X filed an interim report with the SEC which stated,] "An updated resource calculation subsequent to the end of June 1996 from drilling results at a Busang Gold Project increased the total gold resource by 44.3 million ounces to 46.9 million ounces, compared to a total gold resource of 2.6 million ounces at November 30, 1995. This resource calculation has been independently verified by Kilborn

Engineering, engineering consultants."

15. [On December 2, 1996, Bre–X filed with the Ontario Securities Commission a press release dated November 28, 1996, which] "reiterated the July 1996 calculation by the Kilborn Defendants of 46.92 million ounces of gold at Busang." (Complaint, ¶ 170).

16. On or around December 3, 1996, Bre–X issued a press release.... The press release reported that Kilborn had updated its calculation to 57.33 million ounces and that based on the current drill program they anticipated a 60 million ounce estimate by early 1997. (Complaint, ¶ 172).

17. [A December 4, 1996, Bresea press release] reported an upgraded resource calculation, completed by the Kilborn Defendants, for Busang, of 57.33 million ounces of gold.... (Complaint, ¶ 178).

18. [On March 26, 1977, the Kilborn Defendants revealed] for the first time that their original tests, which had calculated the Busang resource at 70.95 millions ounces, were not based on their own independent drilling and assaying:

Bre–X Minerals Ltd. issued a press release earlier today in which it states: "that there appears to be a strong possibility that the potential gold resources on the Busang project in East Kalimantan, Indonesia have been overstated because of invalid samples and assaying of those samples."

Over the past three years, P.T. Kilborn Pakar Rekayasa carried out resource studies and modeling based on geological data, sample and assay information provided to it by Bre–X. The conclusions and recommendations provided in the various studies are believed to be prudent and reasonable and are founded on calculations and

resulting resource calculations showed that the gold resources at Busang, in all categories, were 889 million tonnes at an average of 2.48 grams gold per tonne for a total of 70.95 million ounces of gold.

However, these calculations are dependent on the validity of the samples. P.T. Kilborn Pakar Rekayasa did not drill, did not take their samples' nor did it assay those samples. The scope of its mandate from Bre–X related to resource studies and modeling.

(Complaint, ¶ 225).

In short, the Plaintiffs seem to be contending that the Kilborn Defendants' statements of resource calculations were not based on accepted industry practices. Based on this departure from industry norms, the Plaintiffs seemingly argue, that a strong inference of conscious misbehavior or recklessness on the part of the Kilborn Defendants can be drawn.

### A. Separating the Kilborn Defendants

The Kilborn Defendants argue that the claim against them must be dismissed because the Plaintiffs improperly lump them together in the Complaint. Generally, a complaint must plead fraud with particularity as to each defendant. "Where multiple defendants must respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Thornton v. Micrografx, Inc.,* 878 F.Supp. 931, 938 (N.D.Tex.1995). Throughout the Complaint, the Plaintiffs refer to the "Kilborn Defendants" instead of individually naming them.

As the Plaintiffs correctly argue, under the "group pleading presumption," a complaint need not allege a specific connection between fraudulent representation or omission and each defendant separately, "when the facts are exclusively within the defendant's knowledge." *In re Health Mgmt. Inc. Sec. Litig.,* 970 F.Supp. at 208. This is especially true where "defendants

are insiders or affiliates participating in the statements at issue." *Id.*

The Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required. In many instances, the Complaint refers to Bre–X announcements and it states that they were based upon calculations done by the Kilborn Defendants. In most cases, it is unclear whether the Bre–X announcement failed to name exactly which Kilborn Defendant provided the information, or whether the Plaintiffs simply chose to attribute the estimate to the Kilborn Defendants collectively. In short, the Plaintiffs should, when possible, avoid attributing actions to the Kilborn Defendant's collectively. When not possible, the Plaintiffs should offer an explanation as to why that is the case. Was it because the Bre–X statement at issue did not specify which Kilborn Defendant provided that particular estimate?

Also, the Court can find no reason to apply the group pleading presumption in the case of SNC. If in repleading, the Plaintiffs allege nothing more than the fact that SNC is the parent company of Kilborn Engineering, the Plaintiffs' claim against SNC will be dismissed. *See Baesa,* 969 F.Supp. at 242 ("a subsidiary's fraud cannot be automatically imputed to its corporate parent").

### B. Misrepresentation or Omission

Although the Plaintiffs' claims against the Kilborn Defendants are being dismissed at this point, the Court will resolve one other issue which would undoubtedly be raised by the Kilborn Defendants in subsequent motions to dismiss. If all other requirements are met, the Plaintiffs' claims against the Kilborn Defendants will not fail due to the fact that these Defendants did not directly make a misrepresentation to the investing public.

The Plaintiffs have not alleged that the Kilborn Defendants made a single statement to the investing public. Instead, they allege that "the Kilborn Defendants provided their written resource reports to Bre–X, knowing that Bre–X and Bresea were distributing those reports and their contents to the investing public." (Complaint, ¶ 53). The Kilborn Defendants argue that the Plaintiffs have attempted to, through artful pleading, recast aiding and abetting claims (for which there is no private right of action) as primary claims.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that "a private plaintiff may not maintain an aiding and abetting suit" under 10b–5. Following this decision, the Defendants argue, the distinction between preparing a report for a client in the course of rendering professional services, and the issuance of a certified statement or opinion, is dispositive in assessing professional liability to third parties.

The Defendants rely on *In re Cascade Int'l Sec. Litig.,* 894 F.Supp. 437 (S.D.Fla. 1995), in which the court stated:

> [I]f an accountant does not issue a public opinion about a company, although it may have conducted internal audits or reviews for portions of the company, the accountant cannot subsequently be held responsible for the company's public statements issued later merely because the accountant may know those statements are likely untrue. It follows therefore that an accountant who has not publicly expressed support for the company's financial statements ... has no duty to alert the public to the content, even if inaccurate, of those statements in the future.

*Id.* at 443; *see also Pahmer v. Greenberg,* 926 F.Supp. 287, 306 (E.D.N.Y.1996), *aff'd sub nom. Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997) (holding that an accountant cannot be held liable under securities laws where it "did not issue an opinion or certification as to the prospectus").

Relatedly, the Defendants argue that the issue of whether a defendant is subject to a primary violation claim, as opposed to an aiding and abetting claim, turns on who makes the allegedly fraudulent representation or omission in the market. In support of this proposition, they cite to *Vosgerichian v. Commodore Int'l.* 862 F.Supp. 1371 (E.D.Pa.1994). In that case, the plaintiff alleged that Arthur Anderson ("AA") violated the securities laws by helping its auditing client. Commodore International ("Commodore"), mislead shareholders about the company's financial health. *Id.* at 1373. Specifically, the plaintiff alleged that "AA violated securities laws due to its role in: (1) the Prudential warrant transaction, and (2) the characterization of the litigation settlement as an extraordinary item." *Id.* at 1378.

The "Prudential warrant transactions" concerned Commodore's failure to disclose an obligation to buy back warrants for stock that it had conveyed to the Prudential Insurance Company. AA did not dispute "that it 'advised or concurred' with Commodore's decision [to treat the repurchases as equity transactions]." Nevertheless, the court dismissed the first claim against AA on that ground that "[e]ach and every misrepresentation alleged was made by Commodore. Plaintiff's allegations against AA do not go beyond allegations that AA assisted Commodore in perpetrating securities fraud and are thus not cognizable." *Id.*

The second claim, however, was not dismissed. With respect to that claim, the plaintiff alleged "that AA committed securities fraud by issuing an unqualified, or 'clean,' opinion even though the characterization of the litigation settlements as an extraordinary item allegedly violated 'generally accepted accounting principles.'" *Id.* The court held: "Because plaintiff maintains that AA made false representations itself, in the form of the 'clean' opinion, rather than merely assisting Commodore in its scheme to defraud, the claims

based on the litigation settlement [will not be dismissed]." *Id.*

The Plaintiffs point out that the Court in *Central Bank* stated that its holding "does not mean that secondary actors in the securities markets are always free from liability under the Securities Acts." *Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. As the Plaintiffs note, the Court did not define what acts give rise to primary liability for secondary actors.

The Plaintiffs categorize decisions interpreting *Central Bank* into two categories. In the first category represents a "bright line" test, under which liability attached only if the defendant itself made an allegedly false or misleading statement. *See, e.g. Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1225–27 (10th Cir.1996). Under this approach, there is "no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach." *Id.* at 1226. For example, where a professional was aware that its opinion would be attached to securities filings, it could be held primarily liable for misstatements. *O'Neil v. Appel*, 897 F.Supp. 995 (W.D.Mich.1995).

Under the second category, as described by the Plaintiffs, if a defendant played a "significant role" in preparing a false statement actually uttered by another, primary liability will lie. *See, e.g. In re Software Toolworks, Inc.*, 50 F.3d 615, 628 n. 3 (9th Cir.1994) (accountant may be primarily liable based on its significant role in drafting letter which client sent to SEC); *Phillips v. Kidder Peabody & Co.*, 933 F.Supp. 303, 316 (S.D.N.Y.1996), *aff'd*, 108 F.3d 1370, 1997 WL 138814 (2d Cir.1997); *Cashman v. Coopers & Lybrand*, 877 F.Supp. 425, 432–34 (N.D.Ill.1995) (accountant primarily liable when it drafted sections incorporated into prospectus); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 873 F.Supp. 111, 119 (N.D.Ill.), *aff'd*, 67 F.3d 605 (7th Cir.1995); *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994) (accountant that was intri-

cately involved in creating false documents issued by client is primary violator).

The Court agrees with the Plaintiffs' argument on this point. Though the Kilborn Defendants did not themselves make statements to the public, they are still liable, if all other requirements are satisfied, under either of the theories advanced in the two categories described above.

When and if all other pleading requirements are met, the plaintiffs will have adequately stated a claim against Defendants which made "a false or misleading statement (or omission) that they know or should know will reach potential investors." *Anixter*, 77 F.3d at 1226. Additionally, if the Plaintiffs adequately plead facts showing that any of the Kilborn Defendants played a significant role in developing allegedly false statements made by Bre–X, the Plaintiffs will have sufficiently stated a claim, assuming all other requirements are satisfied.

The Plaintiffs have failed to adequately state a claim against the Kilborn Defendants. Therefore, the claims against these Defendants are dismissed without prejudice.

## VIII. FELDERHOF

The Court has scrutinized the Plaintiffs' allegations against Felderhof, Bre–X's senior vice president, chief geologist and vice chairman of the board. The Plaintiffs have amply stated their federal claims against this Defendant. Therefore, his motion to dismiss these claims is denied.

Assuming the Court would dismiss the federal claims against him, Felderhof also argued that the Court should decline to exercise supplemental jurisdiction over the state law claims against him for fraud and negligent misrepresentation. Felderhof did not make a substantive argument for dismissal of these claims. Therefore, the Court will not dismiss them at this time. If appropriate, these claims may be addressed through a summary judgment motion.

## IX. CONCLUSION

It is hereby ORDERED that the following motions are GRANTED: Defendant Barrick Gold Corporation's Motion and Brief to Dismiss Plaintiffs' Claims (Docket # 256); Motion of Lehman Brothers Inc. to Dismiss Amended Class Action Complaint (Docket # 47); Motion of J.P. Morgan Securities, Inc. to Dismiss Plaintiffs' Second Amended Class Action Complaint (Docket # 233); Motion of Nesbitt Burns Inc. to Dismiss Plaintiffs' Amended Class Action Complaint (Docket # 78); Defendant P.T. Kilborn Pakar Rekayasa's Motion to Dismiss (Docket # 232); Defendant Kilborn Engineering Pacific Ltd.'s Motion to Dismiss for Failure to State Claims upon Which Relief Can Be Granted (Docket # 39); Defendant SNC–Lavalin Inc.'s Motion to Dismiss for Failure to State Claims upon Which Relief Can Be Granted (Docket # 60).

Because the Plaintiffs' federal claims are hereby dismissed, the Court will not exercise supplemental jurisdiction over the state law claims. Both the federal and state claims may be repleaded. It is further

ORDERED that should the Plaintiffs wish the replead, the following deadlines shall be in effect: Amended Complaint shall be filed within 30 days of the filing date of this Order; Motions to Dismiss for Failure to State a Claim shall be filed within 20 days of the service date of the Amended Complaint: Responses shall be filed within 10 days of the service date of the Motions to Dismiss; Replies shall be filed within 5 days of the service date of the Responses. It is further

ORDERED that Defendant Felderhof's Rule 12(b)(6) Motion to Dismiss Amended Class Action Complaint (Docket # 92) is DENIED.